HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLARK ELMORE,

               Plaintiff,

    v.

STEPHEN SINCLAIR,

              Defendant.

No.  08-cv-53 RBL

ORDER DENYING PETITION FOR HABEAS CORPUS

In 1996, Clark Elmore pled guilty and was sentenced to death for the rape and murder of 14-year old Kristy Ohnstad.  He petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, listing thirteen claims of error by the Washington State courts.  (*See* Pet.'s First Am. Pet. for Writ of Habeas Corpus, Dkt. #11).  Upon review, the Court must conclude that Petitioner fails to meet the requirements of § 2254.

## I.   BACKGROUND

### A.   Facts

In considering Elmore's personal restraint petition, the Washington State Supreme Court summarized the facts as follows:

> Clark Elmore was charged with aggravated murder in the first degree and two counts of rape in the second degree arising out of the rape and murder of his stepdaughter, Kristy Ohnstad. Elmore confessed that, en route to Kristy's school, he turned off onto a dirt road alongside Lake Samish, parked his van, and raped Kristy. After the rape, he choked her into unconsciousness and then placed his belt around her neck and tightened it. He inserted a long needle-like instrument in her ear, put a plastic bag over her head, and hit her in the head with a hammer several times causing her death. After the killing, he carried her body into the woods and covered her with plastic.

Order - 1

Elmore participated in the search for his stepdaughter. When he realized her body would soon be found, he fled to Oregon. After approximately 24 hours he returned to Bellingham and surrendered to the police. He waived his right to an attorney and spoke with authorities for approximately three hours. In his confession, Elmore admitted he thought about killing Kristy many times, whenever she brought up the fact that he had sexually molested her at an earlier age.

At his first appearance, Elmore stated that he did not want an attorney and attempted to plead guilty. The trial court declined the plea, set the matter over, and appointed Jon Komorowski as counsel. Mr. Komorowski, as lead counsel, promptly assembled a defense team, including co-counsel Douglas Hyldahl, investigator Michael Sparks, mental health advisor Roxanne Jarvinen, and legal assistant Susan Donato.

The State indicated to counsel that it was considering the death penalty. Mr. Komorowski requested, and received, a continuance of the time for filing a notice of special proceedings to prepare a mitigation report. Mr. Sparks, the defense investigator, compiled a report which included information about Elmore's background, his family's destitute circumstances, and his father's alcoholism and abusive behavior. The report also detailed Elmore's decision to drop out of high school after 11th grade and join the military, his minor criminal offenses including theft and forgery, and his habit of marrying early and often. The report described Elmore as a loner who engaged in recreational drug use. It also revealed that, although Elmore rarely held a steady job, he was a capable mechanic and that he had a long-term, stable relationship with Sue Ohnstad, the victim's mother.

The mitigation report apparently was unpersuasive and the State elected to seek the death penalty. The State alleged two aggravating circumstances: (1) that the murder was committed to conceal a crime and (2) that the murder was committed in the course of, in furtherance of, and in immediate flight from the crime of rape. Elmore entered a plea of guilty to aggravated murder and one count of rape and the matter was set for a special sentencing proceeding.

In preparation for the sentencing trial, Mr. Komorowski consulted with a trial consulting firm on nearly every aspect of the case, including mitigation, jury selection, themes, and theories. The firm selected mock jurors to hear the case. After analyzing film of the mock trials, the firm found that the jurors responded well to remorse and acceptance of responsibility rather than mental health mitigation evidence. Trial Court Findings of Fact (FOF) at 15 (Sept. 10, 2004 reference hearing).

Further investigation was conducted by the defense team between Elmore's guilty plea and his sentencing trial. The team took trips to Walla Walla to meet with Elmore and to Springfield, Oregon, where they attempted to contact people from Elmore's past and to collect records. Mr. Komorowski was aware that Elmore suffered numerous serious head injuries throughout his life, including an incident where Elmore's brother accidentally hit him on the head with an ax. Additionally, the team learned that Elmore had been exposed to Agent Orange in Vietnam, that he worked with chemicals as a mechanic most of his life, that he grew up near an airport that had a history with crop-dusting, and that he was knocked unconscious at least twice in his life. FOF at 17–19.

Petitioner's mother advised the defense team that the injury was not significant. The trial team did not believe that neurological testing was indicated based on the incident.

The defense team did not retain mental health experts prior to advising Elmore to plead guilty. However, in preparation for the sentencing trial, counsel retained Dr. Ronald Kleinknecht, a licensed clinical psychologist in Washington State since 1971. He has served as a consultant to the Whatcom County Public Defender's Office since the early 1980s. Dr. Kleinknecht has testified in capital cases, although he had never testified in the sentencing phase of a death penalty case prior to Elmore's case. FOF at 21. Dr. Kleinknecht's postdoctoral work was primarily in neuropsychology, and he took classes in neurology. However, he did not believe his task in Elmore's case was to assess neuropsychological deficits. FOF at 22. Rather, he believed his task was to determine if Elmore suffered from a mental illness, whether he was competent to stand trial, whether he was insane, and whether he had diminished capacity. FOF at 22. Mr. Komorowski testified that he hired Dr. Kleinknecht to assist the trial team in communicating with Elmore. Mr. Komorowski wanted to know whether the communication difficulties he had experienced with Elmore stemmed from mental health deficiencies. FOF at 21–22.

Dr. Kleinknecht met with Elmore four times over a period of six months in 1995. He conducted a general screening to look for major mental disorders and on more than one occasion he administered the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Kleinknecht was given information on Elmore's background, including work history, education, and family history of mental illness, significant hospitalizations, and clinical records. FOF at 22–23.

The MMPI did not reveal signs of a major mental disorder, schizophrenia, or psychotic-like disorders. According to Dr. Kleinknecht, if there were clinically significant brain damage, he would have expected it to manifest through difficulty in abstract thinking, poor memory, inability to use higher mental processes, and inability to hold objects. He found Elmore a reasonably good historian and found it significant that Elmore had been an automobile mechanic, which requires the ability to hold different parts in the mind at the same time and envision them operating together. FOF at 23–24. Dr. Kleinknecht did not observe any serious impairment in Elmore's cognitive skills, although he did not conduct specific tests. FOF at 24.

Dr. Kleinknecht was not given information about Elmore's lifelong exposure to neurotoxins or his series of head injuries. FOF at 23. According to Dr. Kleinknecht, if he had been given this information, he would have likely referred Elmore for neurotoxic testing. Neuropsychological testing is an accepted method for evaluating whether a person has functional neuropsychological deficits. Dr. Kleinknecht testified that meeting and talking to a person is not a perfect assessment tool for determining brain dysfunction. FOF at 25.

Dr. Kleinknecht referred the trial team to Dr. Ronald Roesch to follow up on his finding of antisocial personality disorder revealed in the MMPI results and to examine Elmore for possible psychopathy. FOF at 25. Dr. Ronald Roesch is a licensed clinical psychologist, a professor of psychology, and the director of the Mental Health Law and Policy Institute at Simon Frasier University. FOF at 25–26. Mr. Komorowski testified that he hired Dr. Roesch because of his background in forensics and in evaluating psychopathy and future dangerousness. Mr. Komorowski also testified that he hired Dr. Roesch to assist him in communicating with Elmore. FOF at 27. Dr. Roesch testified that

he believed his task was to determine whether Elmore met the criteria for psychopathy and to assess the related issue of Elmore's risk for violence in and out of prison. FOF at 27.

Dr. Roesch was given background information about Elmore as well as other documents helpful in assessing risk. Dr. Roesch subsequently interviewed Elmore for four hours. FOF at 27. This interview was structured around the psychopathy checklist. Dr. Roesch reviewed Dr. Kleinknecht's MMPI results to confirm his impression that Elmore lacked any serious indications of mental disorder. FOF at 28. Based on his evaluation of Elmore's remorse and empathy, Dr. Roesch concluded Elmore was not a psychopath. FOF 29.

In his reports, Dr. Roesch characterized the crime as an impulsive, reactive, and a poorly considered attempt to cover up the rape. In Dr. Roesch's opinion, the crime demonstrated overkill, which is consistent with heightened emotional arousal. FOF at 31.

Dr. Roesch's report also indicated that Elmore admitted to a history of deviant sexual arousal, especially towards prepubertal girls. Elmore had acted on those feelings on two occasions. FOF at 28. Mr. Komorowski was gravely concerned about Dr. Roesch's report since it referred to Elmore's history of deviant sexual arousal. Mr. Komorowski was also concerned about Dr. Roesch's finding that after Elmore raped Kristy, he appreciated the seriousness of his act. According to the medical report, Elmore believed his life was over, so he decided to kill Kristy before she regained consciousness. This concerned Mr. Komorowski because it suggested premeditation. He believed this finding would result in a "battle of the experts" about what happened immediately before, during, and after the crime occurred. FOF at 29–30.

Dr. Roesch testified that his evaluation failed to reveal any evidence of organic brain damage, although that was not the focus of his evaluation. Dr. Roesch is not a neurologist, he was not asked to determine whether Elmore suffered from neuropsychological deficits, and he did not perform neuropsychological testing. Dr. Roesch was not given information about Elmore's exposure to neurotoxins, neurological insults, neuropsychological data, or his fraternal twin brother's seizure disorder. If he had been given this information, Dr. Roesch testified that he would have recommended a neuropsychological evaluation. FOF at 30–31.

Dr. Roesch testified he recommended that the defense team contact David Caloff, an expert in posttraumatic stress disorder, which it did. Although Mr. Caloff was not a psychologist, he advised the trial team that Mr. Komorowski reminded Mr. Elmore of his father, which created problems in communications with Elmore. Thereafter, Mr. Komorowski directed other members of the trial team to meet with Elmore in his place, when possible. FOF at 32.

Additionally, the defense team consulted with two experienced death penalty attorneys. Todd Maybrown testified that Mr. Komorowski contacted him to discuss his plan to present a psychologist as a mitigation witness. Mr. Maybrown suggested that Mr. Komorowski expand mitigation evidence to include neuropsychology. The defense team also consulted Bob Mahler, an experienced consultant in capital cases. He advised Mr. Komorowski that a mental defense can be consistent with a remorse defense. FOF at 16–17.

> The defense investigator testified that Elmore desperately wanted to have the case resolved to bring closure for the victim's mother. Elmore was also very concerned about public attention on his case because of the effect it would have on his family, particularly his mother. Pers. Restraint Pet. & Br. in Supp., attach. 10 (Decl. of Michael Sparks). He told Mr. Komorowski not to present evidence of his background and not to call his family members as witnesses. FOF at 36. He also objected to presentation of mitigation evidence, threatening to act out in the courtroom if his wishes were not followed. FOF at 36.
>
> Ultimately, the defense team decided not to present mental health evidence as mitigation. Instead, their strategy was to focus on remorse and Elmore's acceptance of personal responsibility for the crime. Elmore agreed to appear in jail garb throughout the sentencing phase to show that he accepted responsibility for the crime. On the first day of jury selection Elmore also appeared in shackles. After the prosecutor raised concerns about Elmore appearing before the jury in shackles, counsel affirmatively agreed that his client would remain shackled that day. Elmore did not appear in shackles after the first day.
>
> At the sentencing hearing the State relied primarily on Elmore's confession. The State called Detective Gitts who testified about Kristy's disappearance and presented a tape-recorded version of Elmore's confession. The medical examiner testified to the cause of death and the State offered the testimony of police officers who had contact with Elmore during his surrender.
>
> Elmore called five witnesses. Three were Snohomish County judges who testified to Elmore's desire to plead guilty and to his dejected demeanor. The fourth witness was Mr. Sparks, the defense investigator. Sparks presented biographical testimony and a pictorial of Elmore's life. The final witness was Professor David Boerner who testified regarding the effect of Elmore's prior felonies under the "three strikes" law. The defense case took approximately one hour.
>
> The jury found that there were not sufficient mitigating circumstances to merit leniency and the court imposed the sentence of death.

*In re Pers. Restraint of Elmore*, 162 Wash. 2d 236, 244–50 (2007). The court denied Elmore's personal restraint petition on November 21, 2007.

**B.     Elmore's Claims**

On April 22, 2008, Elmore filed a petition for habeas corpus presenting the following claims:

(1) Elmore did not receive notice of the crimes to which he pled guilty because the information failed to specify the crimes Elmore concealed by the murder. (First Am. Pet. at 12.)
(2) Elmore's guilty plea is invalid because he did not understand the law in relation to the facts. (*Id.*)
(3) Defense counsel failed to sufficiently explain the consequences of pleading guilty to Mr. Elmore. (*Id.* at 24.)

(4) Elmore was denied an impartial jury because a juror misled the court by stating that he had not been sexually abused. (*Id.* at 32.)

(5) Elmore was denied due process because he was shackled during the first day of the penalty proceeding, and his counsel was ineffective by failing to object. (*Id.* at 44.)

(6) Elmore was denied effective assistance of counsel because counsel failed to conduct a competent mitigation investigation. (*Id.* at 65.)

(7) Elmore was denied effective assistance of counsel because counsel failed to present certain compelling evidence of remorse. (*Id.* at 65.)

(8) Elmore was denied effective assistance of counsel because defense counsel failed to object to the prosecution's arguments on future dangerousness. (*Id.* at 91.)

(9) Elmore was denied effective assistance of counsel because defense counsel agreed to allow redaction of Elmore's statements. (*Id.* at 96.)

(10) Elmore's right to be present, to effective assistance of counsel, and to due process were violated because the court provided a tape player to the jury without notice to Elmore. (*Id.* at 96.)

(11) The Washington Supreme Court misapplied evidentiary rules. (*Id.* at 96.)

(12) The trial court improperly instructed the jury. (*Id.* at 124.)

(13) The Washington Supreme Court conducted a "proportionality review" in an arbitrary manner contrary to statutory law. (*Id.* at 137.)

## II.   DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, a federal court may grant an application for a writ of habeas corpus only if the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Court's review under § 2254(d) is limited to the factual record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The court must presume that factual determinations made by the state court are correct. *Id.* § 2254(e)(1). If a petitioner "failed to develop the factual basis of a claim in State court," a federal court may hold an evidentiary hearing only if the petitioner shows that the claim: (1) relies on "a new rule of constitutional law" that was previously unavailable and made retroactive by the Supreme Court; or (2) relies on "a factual predicate that could not have been previously discovered

through the exercise of due diligence." *Id.* § 2254(e)(2)(A)(i)–(ii).  Here, Mr. Elmore has not provided grounds for an evidentiary hearing on his claims, and the Court finds no grounds on which to grant habeas relief.

### A. The Charging Document

Elmore argues that the information charging him with first-degree aggravated murder failed to specify whether Elmore murdered Kristi Ohnstad to conceal the rape or the earlier molestation. (First Am. Pet. at 12.)  He asserts that the omission deprives him of due process and his right to notice of the crime charged under the Sixth Amendment.  *Id.*

Clearly established Supreme Court precedent requires that a defendant have notice of the charge against him.  *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).  And as the Washington Supreme Court held, Mr. Elmore received notice of the crimes with which he was charged.  The state court held that "[t]he exact crime is not an element of the aggravating circumstances under the statute." *In re Elmore*, 162 Wash. 2d at 272; *see also Jeffries v. Blodgett*, 5 F.3d 1180, 1194 (9th Cir. 1993).  In other words, the nature of the predicate crime is irrelevant; the statute requires only that the murder be committed in order to conceal *a* crime.  That question was properly submitted to the jury.

Further, Mr. Elmore cites no case suggesting that a predicate crime must be specified in the circumstances here.  And in any event, he fails to explain why the difference—whether he was concealing the rape or the molestation—would make a difference. Thus, Elmore shows no prejudice.

### B. Guilty Plea

Mr. Elmore argues that his guilty plea was not voluntary, knowing, and intelligent—but this is merely a corollary to his argument that the charging document was flawed.  In other words, Elmore argues (incorrectly) that he lacked notice of the crime charged, and thus, his plea could not meet constitutional muster. (First Am. Pet. at 23.)  Because the Court has already rejected the premise of his argument, it must reject his conclusion as well.

### C. Ineffective Assistance of Counsel Based on a Failure to Explain Consequences of Pleading Guilty

Mr. Elmore next argues that he was denied effective assistance of counsel because Mr. Komorowski advised him to plead guilty. (First Am. Pet. at 24.) To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy a two-part test: he must show that (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) that counsel's deficient representation was "prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 689. Given the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction," a court "must be highly deferential" and resist using the benefit of hindsight to judge counsel's decisions. *Id.* Thus, the defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Here, the state court correctly determined that Mr. Elmore received effective assistance of counsel.

The Washington Supreme Court held that advising Elmore to plead guilty was not ineffective assistance. First, Mr. Elmore had repeatedly attempted to plead guilty—on the record. (*See* Def.'s Ans. to Pet. at 48) (noting Mr. Elmore's in-court statements: "I'm guilty. . . . I did it. I ain't going to fight it. I did it."). Second, Mr. Elmore had "expressed a desire to spare his family from the publicity associated with a trial and a desire to take responsibility for his actions." *In re Elmore*, 162 Wash. 2d at 256. Third, Mr. Komorowski testified that his strategy was "built around the dual themes of remorse and taking responsibility." *Id.* Given that Mr. Elmore "had no viable defense" (and a prosecutor who flatly refused to bargain), attempting to prove his innocence might have undermined his credibility during the penalty phase (when arguing that he was remorseful and took responsibility for his action). This was Mr. Komorowski's reasoning, and this Court cannot declare his counsel "ineffective" simply because his strategy was not successful. *See Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999)

("Effectiveness must be judged as of the time the legal services were rendered so as to minimize the distortions of hindsight.").

In sum, counsel's advice to plead guilty was the product of reasonable strategy—his client wanted to plead guilty, the prosecutor refused to negotiate, and any attempt at proving innocence would have been futile and would have possibly detracted from Mr. Elmore's claims of taking responsibility and feeling remorse. The state court therefore reasonably determined that Petitioner failed to overcome the presumption of reasonableness.

**D.     Juror Misconduct**

Mr. Elmore asserts that Juror 12 misled the court and the parties by failing to reveal that he had been sexually molested as a child and would therefore have been biased against Mr. Elmore. (First Am. Pet. at 32.)

The Sixth Amendment requires that a criminal defendant's case be heard by a "panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Thus, a court must ask if a juror's views would "prevent or substantially impair the performance of his duties . . . in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). To receive a new trial, a petitioner must demonstrate that "a juror failed to answer a material question on voir dire and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Further, for claims of trial errors, a petitioner must show not only error, but that the error had a "substantial and injurious effect or influence in determining the jury's verdict" in order to merit habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citations omitted) (requiring "actual prejudice").

Juror 12 stated during a post-trial interview that he had experienced two incidents of sexual molestation: one where he was "spooned" by another boy, and a second where another boy groped him while he was asleep. *In re Elmore*, 162 Wash. 2d at 267. In light of those incidents, Mr. Elmore asserts that Juror 12 should have answered "yes" to two voir-dire questions: "Have you . . . been the victim of a crime . . . ," and " [h]ave you . . . been the victim of a sexual offense?" *Id.* at 266. Juror 12 answered both questions "no."

Following the penalty proceeding, Juror 12 testified at deposition that he did not consider either incident illegal and did not think of the incidents at all when the questions were raised. (*See* Ans. to Pet. at 67 (quoting Juror 12's post-trial deposition) ("My experiences didn't ever once come to mind that entire trial"; "I do not feel that I was a victim of a sexual offense")). Based in part on that testimony, the Washington State Supreme Court concluded that the incidents were "very minor," did not involve "violence or rape," and that "[m]inimal sexual contact between two young boys is significantly different from the rape and murder charges Elmore faced." *In re Elmore*, 162 Wash. 2d at 268–69. As such, the court found that Elmore could not "demonstrate that the answers would have supported a challenge for cause" against Juror 12 and therefore denied his claim. This Court sees no inconsistency in Juror 12's answers and cannot discern an unreasonable determination of facts or application of law in the state court's holding. In any event, Mr. Elmore shows no actual prejudice.

### E.     Appearance in Shackles

Mr. Elmore appeared on the first day of jury selection (a two-week affair) in shackles and "jail greens." Mr. Komorowski agreed to allow Elmore to appear shackled: "We don't have an objection as it is now. . . . I think the [prospective] jurors would expect him at this point to be in custody and I would just leave it at that and defer to the court to see if there's anything else that the court feels should be of record at this point." *State v. Elmore*, 139 Wash. 2d 250, 272 (1999). The trial court replied: "I think as long as the decision has been carefully thought through for whatever reasons, if the defense team *wants* to do that, that's fine." *Id.* at 273 (emphasis added).

Mr. Elmore now asserts that by allowing him to voluntarily appear in shackles on the first day of juror selection, the trial court violated his due process rights under the Fifth and Fourteenth Amendments, and violated an unspecified right under the Eighth Amendment. (First Am. Pet. at 44.) Further, Mr. Elmore asserts that Mr. Komorowski's failure to object constituted ineffective assistance of counsel and that the effect on the jury was sufficiently prejudicial as to warrant a new proceeding.

The Washington State Supreme Court rejected the due process claims on direct appeal for the simple reason that the court ***did not compel him to appear shackled***: "Elmore's shackling

was self-imposed." *Elmore*, 139 Wash. 2d at 275. In reviewing his personal restraint petition, however, the state court held that Mr. Komorowski's failure to object fell below an objective standard of reasonableness. *In re Elmore*, 162 Wash. 2d at 261. Nonetheless, it affirmed the sentence because Elmore failed to show that "there was a reasonable probability that, but for the deficient conduct, the outcome of the proceeding would have been different." *Id.*

Here, Mr. Elmore fails to show either an unreasonable application of clearly established federal law or an unreasonable determination of facts. First, no federal statute or Supreme Court precedent suggests that a defendant may agree to be shackled and then claim a deprivation of due process.[1] Thus, Mr. Elmore's claims of error under the Fifth and Fourteenth Amendments are meritless.[2]

Second, the Court must agree that Mr. Komorowski's error was harmless. The state court held that Mr. Elmore appeared shackled only on the first day of a two-week voir dire (and never at the penalty proceeding itself), and because Elmore's "trial strategy was to demonstrate remorse and accept responsibility," counsel could reasonably have concluded that the jail greens and shackles would lend credence to the argument. *In re Elmore*, 162 Wash. 2d at 261. This Court finds no error in the state court's reasoning.

### F.   Mitigation Investigation

Mr. Elmore contends that Mr. Komorowski rendered ineffective assistance by failing to investigate mitigating factors, specifically, brain damage. (First Am. Pet. at 68.) The state supreme court conducted an evidentiary hearing into the question but concluded that "Mr. Komorowski's team *did* an in-depth investigation." *In re Elmore*, 162 Wash. 2d at 254. Further, "counsel's strategy [of] rely[ing] on Elmore's remorse . . . would have been undermined by an attempt to diminish Elmore's culpability through presentation of mental health experts," and it was thus reasonable to avoid presenting a mental-health based defense. The Court here finds no error in the state court's decision.

---

[1] Indeed, Mr. Elmore relies on *Deck v. Missouri*, 544 U.S. 622 (2005), in support of his due process claims. Apart from the fact that *Deck* is inapplicable because it was announced five years after Elmore's final judgment, see *Teague v. Lane*, 489 U.S. 288, 310 (1989), the case applies only where a court "orders the defendant to wear shackles," not wear the defendant seeks to wear them for strategic purposes.

[2] Mr. Elmore asserts an eighth-amendment claim in the heading (First Am. Pet. at 44), but fails to address it whatsoever in the substance of his petition, and the Court therefore disregards the claim.

The state court rightly noted that Mr. Komorowski's team performed an in-depth investigation. Mr. Komorowski hired Dr. Kleinknecht, a licensed clinical psychologist, to assess any psychological deficits that might explain Elmore's actions. *In re Elmore*, 162 Wash. 2d at 246. Dr. Kleinknecht met with Mr. Elmore four times, conducted multiple tests, and found no signs "of a major mental disorder, schizophrenia, or psychotic-like disorder[]." *Id.* at 247. The court noted that Dr. Kleinknecht testified that "if there were clinically significant brain damage, he would have expected it to manifest through difficulty in abstract thinking, poor memory, inability to use higher mental processes, and inability to hold objects"—none of which were exhibited by Mr. Elmore. *Id.* Dr. Kleinknecht then referred the defense team to Dr. Roesch, who has a background in "forensics and in evaluating psychopathy and future dangerousness." *Id.* at 248. Dr. Roesch's interview provided no evidence that Mr. Elmore suffered from any psychological deficit that might have been presented as a mitigating factor. Moreover, Dr. Roesch "testified that his evaluation failed to reveal any evidence of organic brain damage." *Id.* at 249. Based on this investigation, the state court reasoned that Mr. Komorowski had conducted an effective mental health investigation.

Mr. Elmore argues that the mental-health investigation was ineffective because it did not include a neurotoxicologist. But, as noted by the state court, the tests performed by Drs. Kleinknecht and Roesch both indicated that Mr. Elmore suffered from no mental impairment— organic or otherwise.

The state court further held that it was reasonable for Mr. Komorowski to avoid a mental-health defense because pursuing that avenue would have opened the door to damaging counterevidence from the prosecution and undermine his remorse argument. The court noted that engaging in a "battle of experts" would have encouraged jurors to focus on Elmore's "history of deviant sexual arousal" and emphasize his thought process—that Elmore killed Kristi to escape responsibility for the rape (and hence, premeditation). *Id.* at 248–49. Moreover, the state court noted that Mr. Elmore's remorse waned as the case progressed, and giving the prosecution cause to investigate his mental state might have informed them of that fact. *Id.* at 265–66.

Lastly, the state court held that the defense team's decision not to present mental health evidence complied with Mr. Elmore's personal wishes "to have the case resolved to bring closure for the victim's mother" and because of the effects on his own family. Indeed, Mr. Elmore "threaten[ed] to act out in the courtroom if his wishes were not followed." *Id.* at 251. This Court finds no grounds to fault the state court's decision.

### G.   Presentation of Mitigation Evidence

Mr. Elmore next faults Mr. Komorowski's decision not to present testimony of "profound remorse" from Michael Sparks, the defense investigator as well as three other potential witnesses¶.[3] (First Am. Pet. at 85.) Mr. Elmore called five witnesses, four of which testified as to his remorse. *In re Elmore*, 162 Wash. 2d at 264 (noting that three judges and Mr. Sparks testified as to Mr. Elmore's remorse). The Washington Supreme Court found that "Mr. Komorowski prepared an in-depth mitigation report that was presented to the jury," and that testimony of remorse in addition to the four witnesses presented would have been cumulative. *Id.* at 265. Perhaps more importantly, the state court noted that as the case progressed, Mr. Elmore "began to verbalize things that were very troubling . . . ." *Id.* Specifically, "[a]fter learning that [Kristi's mother] no longer had feelings for him, Mr. Elmore indicated that he had no one to apologize to for his crimes . . . ." *Id.* Mr. Komorowski therefore sought to avoid giving the prosecution a reason to interview "jailers, transportation officers, and even the jail chaplain," lest they discover his waning remorse and thereby destroy Mr. Elmore's only viable defense. *Id.* at 265–66. It is therefore understandable that Mr. Komorowski did not present testimony from those who might have presented damning testimony on cross-examination. *See Strickland v. Washington*, 466 U.S. 668, 700 (1984) (possibility opening door to damaging rebuttal evidence suggests that failure to present evidence was not prejudicial).

Again, this Court finds no unreasonable application or law or unreasonable determination of facts by the state court.

### H.   Failure to Object to Prosecution's Argument on Future Dangerousness

---

[3] Defense counsel appears to argue that Mr. Komorowski should have also called Dana Sellars, the jail minister, Donald Pierce, a jail officer, and Terry Unger, an associate of Mr. Elmore's. (First Am. Pet. at 85.) While the petition addresses only Mr. Spark's testimony, the Court will assume that Mr. Elmore's claim mimics his PRP claim and therefore includes Sellars, Pierce, and Unger.

Mr. Elmore contends that Mr. Komorowski rendered ineffective assistance by failing to object to the State's arguments on future dangerousness. (First Am. Pet. at 91.) At closing, the State argued that the jury should infer dangerousness from the facts of the crime. *Id.* (citing trial transcript). He argues that "the prosecutor's arguments needed to be framed in terms of a life without parole sentence." *Id.* at 94.

No Supreme Court precedent suggests that a prosecutor cannot ask a jury to infer future dangerousness from the facts of the crime committed. (Indeed, this would be counter to common sense.) It was not therefore error for Mr. Komorowski to fail to object to such an argument.

**I.     Redaction of Taped Confession**

Next, Mr. Elmore argues that he was deprived of due process when the jury was provided with a tape recorder on which to play his confession, and Mr. Komorowski was ineffective in failing to object to a redaction on the tape. (First Am. Pet. at 96) (including ancillary eighth-amendment claim).

According to Mr. Elmore, he gave a "detailed" confession to police, and that confession contained inadmissible segments. *Id.* The State redacted those portions, but also mistakenly redacted the following paragraph:

> We barely tolerated each other . . . . Which, again, is probably my fault. After all this was said and done, then I started to realize where I had made a lot of mistakes with Kristy. Cause the only time I ever talked to Kristy was to yell at her for something she didn't do that she was supposed to do. I didn't ever spend any time with Kristy. Maybe this is because of the first time, I felt so guilty about it.

*In re Elmore*, 162 Wash. 2d at 273. Because the section had been mistakenly redacted, a detective read the paragraph directly to the jury. (First Am. Pet. at 97.) The jury then listened to the taped-confession in deliberations, even though it did not contain the paragraph above.

The Washington Supreme Court noted that on direct appeal the court held that the confession "was the case for both sides—it 'both described the crime and reflected Elmore's decision to come back and take responsibility.'" *In re Elmore*, 162 Wash. 2d at 273 (citing *Elmore*, 139 Wash. 2d at 297). The state court dismissed the argument as having been resolved on direct appeal.

Here, the Court finds no fault. Mr. Komorowski, if anything, successfully emphasized the passage (which the defense characterizes as remorseful) by having it read directly to the jury on cross-examination. Thus, it was not error for Mr. Komorowski to agree to have the passage read rather than demand an unredacted tape. *In re Elmore*, 162 Wash. 2d at 273. In any event, the passage is hardly the revelatory statement of remorse that the defense paints it, and the state court found no prejudice as a result of its redaction. Further, Mr. Elmore cites no Supreme Court precedent for the proposition that a jury may not listen to admissible taped evidence in deliberations. His claim is meritless.

### J. Misapplication of Evidentiary Rules

Mr. Elmore argues that the Washington Supreme Court retroactively applied its decision in *State v. Castellanos*, 132 Wash. 2d 94 (1997), in allowing the jury to take his tape-recorded confession into deliberations. But as the State argues, and as Elmore concedes, *Castellanos* did not alter the existing evidentiary rule. (First Am. Pet. at 119) (noting that "*Castellanos* did not purport to change the rule enunciated in *Frazier*"). Indeed, Washington Rule of Criminal Procedure 6.15(e) states that the jury "shall take with it . . . all exhibits in evidence" when it deliberates. Thus, regardless of *Castellanos*, the jury was entitled to the tapes.

### K. Jury Instructions

The Court struggles to understand the basis for defense counsel's argument here. It appears that the defense argues that the jury instruction created some sort of improper "nexus," and that the prosecution wrongly encouraged the jury to focus on the facts of the crime rather than mitigating factors (which is of course, nonsensical). As stated in the Petition:

> The statutory question posed to Mr. Elmore's sentencing jury required a nexus between the crime and the mitigation presented, thereby preventing Mr. Elmore's jury from considering and giving effect to the mitigation evidence presented at trial in violation of the Eighth and Fourteenth Amendments.

(First Am. Pet. at 124.) The jury instruction read: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" *Id.* (noting that the instruction, as written, is mandated by Wash. Rev. Code § 10.95.060(4)). The defense appears to object primarily to the words "having in mind," as they indicate some sort of "nexus."

The defense also emphasizes that at closing, the prosecution "spoke almost exclusively about the facts of the murder," and did not discuss mitigating factors at length. *Id.* at 125. The Court would be more surprised if the prosecution had done the reverse.

As an initial matter, federal courts do not grant habeas relief for errors of state law. *Estelle v. McGuire*, 502 U.S. 52, 68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Further, the Ninth Circuit has expressly upheld the constitutionality of this particular jury instruction. *Brown v. Lambert*, 451 F.3d 946, 947–48 (2006). Mr. Elmore must cite some federal constitutional right violated, and he does not. In any event, the state trial court merely instructed the jury to keep Mr. Elmore's crime in mind when pondering the mitigating evidence (as mandated by statute), and the defense presents nothing—statute or precedent—suggesting this is improper.

**L.    Proportionality Review**

In his final claim, Mr. Elmore argues that the Washington Supreme Court conducted its proportionality review in an arbitrary manner and contrary to statute because the state's tracking database (which collects reports from trial judges following capital cases) is deficient. (First Am. Pet. at 137.) On direct appeal, Mr. Elmore challenged the proportionality of his sentence. The Washington Supreme Court held that because "the facts of Elmore's case are similar to some of the facts in other cases in which the death penalty was upheld, the sentence [was] proportionate." *In re Elmore*, 162 Wash. 2d at 269. In his personal restraint petition, Mr. Elmore argued, as he does here, that the proportionality review was flawed because many of the reports in the database have unanswered questions or answers that are too short. (First Am. Pet. at 138.) The state court held that a "large number of cases [were] available [to] provide the court with a sufficient number to enable it to complete a valid and meaningful proportionality review," and thus rejected Mr. Elmore's claim.

The State responds to Mr. Elmore's arguments two-fold: First, the proportionality review was proper, and second, even if it were not, the claim is not cognizable on habeas review. As to the first, Mr. Elmore argues without factual basis that the state's database is sufficiently incomplete as to render the review arbitrary. But, whether the database is incomplete is not the

question.  The state court reasoned that Elmore's sentence was proportionate if a sufficient number of other cases shared facts and resulted in the same sentence.  The state court found those cases, and thus found the sentence proportionate.  Mr. Elmore does not contest that his case is an outlier; he suggests only that Washington's database is incomplete.

As to the second point, the State is correct.  Mr. Elmore concedes that "[t]he United States Supreme Court has held that the Constitution does not require comparative proportionality review . . . ."  (First Am. Pet. at 141) (citing *Pulley v. Harris*, 465 U.S. 37, 50 (1984).  Further, Mr. Elmore acknowledges that claims of state-law violations are not cognizable on habeas review.  *Id.* (citing *Pulley*, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.")).  Thus, Mr. Elmore presents this Court with no federal law, either statute or Supreme Court precedent, that would provide a basis to grant relief.

**M.    Cumulative Error**

Mr. Elmore's claim for cumulative error (First Am. Pet. at 121) fails because the Court finds no error on which to base such a claim.

### III.    CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is **DENIED**.  Because Mr. Elmore has not made "a substantial showing of the denial of constitutional right," the Court cannot issue a certificate of appealability.  28 U.S.C. § 2253(c)(2).

DATED this 21st day of June, 2012

_____
Ronald B. Leighton
United States District Judge